## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

VIRGINIA M. GREGORY,        :

        Plaintiff,       :

                                     Case No. 3:09CV0207

vs.                  :

                                     District Judge Thomas M. Rose

MICHAEL J. ASTRUE,       :     Magistrate Judge Sharon L. Ovington
     Commissioner of the Social
     Security Administration,     :

        Defendant.     :

## REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Virginia M. Gregory sought financial assistance from the Social

Security Administration ["SSA"] by applying for Disability Insurance Benefits

["DIB"] in April 2004, alleging disability since January 7, 2003. (Tr. 59-61). She

claims disability from fibromyalgia, osteoarthritis and cervical spine nerve

impingement. (Tr. 65).

After various administrative proceedings, Administrative Law Judge

["ALJ"] Melvin A. Padilla denied Plaintiff's DIB application based on the ALJ's

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 30). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc. # 14), the administrative record, and the record as a whole.

At a minimum, Plaintiff seeks remand of this case to the SSA to correct certain claimed errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II. BACKGROUND

Plaintiff was 64 years old at the time of the administrative decision, and thus was considered to be "closely approaching retirement age" for purposes of resolving her DIB claim. *See* 20 C.F.R. § 404.1563(e); (*see also* Tr. 62). She has a high school education. *See* 20 C.F.R. § 404.1564(b)(4); (*see also* Tr. 71). Plaintiff has worked in the past as a unit secretary and nurse technician at a hospital. (Tr. 66, 94).

During the administrative hearing, Plaintiff testified that she cannot work due to chronic pain in her low back, legs, arms, neck, shoulders and hands. (Tr. 457). Plaintiff also testified that "rebound headaches" about which her doctor had expressed concern had not been a problem for her. (Tr. 460). Her medications at the time of the hearing included Lyrica, Vicodin E and Baclofen. (Tr. 461). She had not had any trigger point injections. (*Id.*). She stated that she had difficulty with concentration and memory due to depression. (Tr. 462). She testified that she napped about five hours during the day, and that her medication made her drowsy. (Tr. 464-65). Plaintiff further testified that she had been attending aqua therapy three times a week. (Tr. 461-63). Plaintiff acknowledged that she had been advised to lose weight, but that was "a lot easier said than done." (Tr. 465).

Plaintiff estimated that she could walk for about 10 minutes, stand for about five minutes, and sit for about 15-20 minutes. (Tr. 465-66). She was most comfortable if she could change positions or lie down on her side. She estimated that she could lift five to six pounds. (Tr. 466).

As to her activities of daily living, Plaintiff said that she could not sweep, mop or run a vacuum. (Tr. 467). Plaintiff said that she did not climb stairs and sometimes needed help getting dressed. (*Id.*). She could not lift a laundry basket,

but she could run the washing machine.  (Tr. 467-68).  Her son did most of the household chores.  She went to the grocery store only if someone accompanied her.  She tried to go to church every week but usually succeeded only twice a month.  (Tr. 468).

In addition to Plaintiff's testimony, the administrative record contains Plaintiff's medical records.  In her Statement of Errors, Plaintiff does not challenge the ALJ's findings with respect to her alleged mental impairments.  Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged exertional impairments.

Reginique L. Green, M.D.  The record contains treatment notes dated December 2002 through July 2006 from Dr. Green as Plaintiff's primary care physician.  (Tr. 291-373, 393-438).  Plaintiff was diagnosed with fibromyalgia, arthritis and chronic pain syndrome, and prescribed pain medication.  (*Id.*).  Dr. Green's treatment records document positive tender points.  An examination from January  2003 showed that Plaintiff had 12+ trigger points.  (Tr. 332).  At that time, Dr. Green restricted Plaintiff from work due to "medical problems."  (Tr. 368).  In March 2003, Dr. Green noted that Plaintiff had 9+ trigger points.  (Tr. 324).  In April 2003, examination revealed 10+ tender points.  (Tr. 328).  In August 2003, Dr. Green's examination showed 13+ trigger points (Tr. 319); in November

2004, Plaintiff had 11+ trigger points (Tr. 292); in August 2005, Plaintiff had 12+ trigger points Tr. 425); in December 2005, Plaintiff had 11+ trigger points (Tr. 412); in February 2006, Plaintiff had 9+ trigger points (Tr. 408); and in July 2006, Plaintiff had 11+ trigger points. (Tr. 393).

In a teledictation report dated August 14, 2003, Dr. Green reported that she first saw Plaintiff in November 1999. (Tr. 313-15). She opined that Plaintiff had a recurring but intermittent pain syndrome that prevented her from functioning normally. (*Id*.). Dr. Green felt that Plaintiff's inability to concentrate secondary to pain was the primary factor in her inability to function on her job. (*Id*.). According to Dr. Green, Plaintiff could not work full days or keep a regular schedule. (*Id*.). She could engage in limited walking and sitting on her good days, but no real bending or stooping. (*Id*.). She could do some limited grasping. (*Id*.). However, when in severe pain, Plaintiff was unable to concentrate and communicate effectively, secondary to her pain, which often moves her employer to ask her to leave if she is ill. (*Id*.).

An x-ray of Plaintiff's right shoulder in March 2004 revealed mild degenerative changes. (Tr. 356). In April 2004, an MRI showed mild degenerative changes of the right shoulder joint as well as signs consistent with

an abnormal tendon. (Tr. 230). In June 2004, Plaintiff underwent surgery on her right shoulder to repair a rotator cuff tear. (Tr. 235-44, 286-90).

Antonela Svetic, M.D. Plaintiff underwent a neurological evaluation in May 2005 with Dr. Svetic, a neurologist. (Tr. 384-85). Plaintiff complained of pain over her whole body as well as headaches two to three times weekly, lasting "a few hours to one day." (Tr. 384). Plaintiff's motor examination was normal. (*Id.*). Her sensory examination showed slightly diminished sensation in her right face, arm and leg. (*Id.*). Dr. Svetic's impression was chronic pain syndrome under partial control, and chronic mixed headaches with rebound headaches due to medication overuse. (Tr. 385). Dr. Svetic opined that the right-sided sensory deficit likely was due to anxiety, and noted that Plaintiff's "rebound headaches" indicated that she "should be tapered off Vicodin, Soma and Ultram," her pain medications and muscle relaxers. (*Id.*).

A MRI of Plaintiff's cervical spine taken on May 13, 2005, revealed very minor spondylotic bar formation at C6-7. (Tr. 387).

In June 2005, Plaintiff reported that Topamax did not help her pain. (Tr. 382-83). She understood the concept of rebound headaches, but could not stop using Vicodin, Soma and Ultram. (Tr. 382). She reported that her headaches did not concern her. (*Id.*). Dr. Svetic thought that pain and tingling in Plaintiff's

6

hands and arms could be due to carpal tunnel syndrome, but Plaintiff did not want to undergo another EMG, indicating that an EMG done a few years prior had shown carpal tunnel syndrome. (Tr. 383). Dr. Svetic's impression was chronic pain syndrome under partial control, and chronic mixed headaches with rebound headaches due medication overuse. (Tr. 382).

An MRI of Plaintiff's brain taken on June 17, 2005, showed "[s]everal small areas of microvascular change." (Tr. 386).

Dr. Svetic completed interrogatories wherein she opined that Plaintiff would be limited in her ability to perform the physical demands of work due to chronic pain syndrome. (Tr. 388-92). Dr. Svetic did not specify the degree of limitation. (*Id.*).

William D. Padamadan, M.D. In May 2003, Plaintiff was evaluated by Dr. Padamadan on behalf of the Ohio Bureau of Disability Determinations ["BDD"]. (Tr. 189-96). Dr. Padamadan's examination showed no trigger points of fibromyalgia in the neck or upper chest. (Tr. 190). Superficial touch caused Plaintiff to grimace, but no such reaction was noted when pressure was applied with the stethoscope in different locations on the chest, neck and front and back of the chest. (*Id.*). Pinch sign on the back of the chest and back was negative for trigger points. (*Id.*). Dr. Padamadan also found full strength and full range of

motion in Plaintiff's arms and legs. (Tr. 191). A neck x-ray showed slight narrowing at C6-7. (Tr. 197). Dr. Padamadan diagnosed Plaintiff with fibromyalgia with functional syndrome; type II diabetes; high blood pressure under treatment; and no peripheral signs of osteoarthritis. (Tr. 191). Dr. Padamadan opined that Plaintiff would be unable to perform prolonged walking, repeated lifting and bending.[2] (Tr. 192).

Dr. Padamadan tried to re-examine Plaintiff in July 2004, but was unable to do so because she had undergone surgery for a torn rotator cuff the month before. (Tr. 245-51). Plaintiff still was wearing a sling "for an unknown reason" (Tr. 245), and Dr. Padamadan stated that during the examination, Plaintiff "started screaming and crying because of the process of lying down on the bed." (Tr. 246). "She was complaining so much and she would not use her fingers for gripping[,] claiming that it caused her to have hip and neck pain." (*Id.*). Dr. Padamadan terminated the examination, noting "inappropriate complaints of pain." (*Id.*).

Plaintiff's re-scheduled examination was performed by Dr. Padamadan in August 2004. (Tr. 252-60). Dr. Padamadan reported that Plaintiff did not have fibromyalgia trigger points on the chest, back, hip or arms. (Tr. 252, 254).

---

[2]In fact, Dr. Padamadan indicated that Plaintiff "agrees" that she would be able perform all functions, with these exceptions. (Tr. 192).

"[M]assaging the front and back of the chest, elbows, and sides of the thumbs . . . did not cause her any trigger points or positive pinch signs." (Tr. 254). In fact, Dr. Padamadan stated that Plaintiff "even enjoyed the massage and told my assistant that she received a free massage." (*Id.*). Dr. Padamadan recorded some back pain (Tr. 255), but noted that Plaintiff had full strength and full range of motion in her limbs. (Tr. 254-55). Dr. Padamadan diagnosed Plaintiff with obesity; history of fibromyalgia without trigger points; type II diabetes; and back pain (Tr. 255), but found no physical limitations. (Tr. 256).

William R. Kelley, M.D. In September 2003, state agency reviewing physician Dr. Kelley opined that Plaintiff could frequently lift 25 pounds and occasionally lift 50 pounds, and could stand, walk and sit for about six hours out of an eight-hour workday. (Tr. 180-88).

Robert E. Norris, M.D. In September 2004, state agency reviewing physician Dr. Norris opined that Plaintiff could lift 25 pounds frequently and 50 pounds occasionally; could sit and stand/walk for about six hours each out of eight hours; and should avoid heights. (Tr. 281-84). State agency reviewing physician W. Jerry McCloud, M.D., affirmed Dr. Norris' opinions in January 2005. (Tr. 284, 375).

## III. THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A. <u>Applicable Standards</u>

The SSA provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997), *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4); (*see* Tr. 19-21). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.      The ALJ's Decision**

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff meets the insured status requirements of the Act through March 31, 2008.  (Tr. 23).  The ALJ also found that Plaintiff has not engaged in substantial gainful activity since January 7, 2003.  (*Id.*).

The ALJ found at Step 2 that Plaintiff has the severe impairments of chronic complaints of general body arthralgias with a functional component and pain medication overuse; obesity; and depression.  (*Id.*).  The ALJ determined at

Step 3 that Plaintiff does not have an impairment or combination of impairments that meet or equal the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (Tr. 25).

At Step 4, the ALJ found that Plaintiff retained the residual functional capacity ["RFC"] to perform a limited range of medium work with the following restrictions: 1) alternating positions; 2) low stress jobs with no fast paced, inherently stressful or hazardous duties; 3) no frequent changes in job duties; 4) inside work in a temperature-controlled environment; and 5) no work involving ladders, scaffolds or unprotected heights. (Tr. 27). The ALJ further found that Plaintiff is unable to perform any of her past relevant work as an escort, unit clerk or social service aide. (Tr. 29). Nevertheless, based on the testimony of the vocational expert, the ALJ determined that Plaintiff remains able to perform a significant number of unskilled medium, light and sedentary jobs available in the regional economy. (Tr. 30). This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and thus not eligible for DIB. (Tr. 30-31).

## IV.   JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ

are supported by substantial evidence." *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a

claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. DISCUSSION

### A. The Parties' Contentions

The main issues in this matter are whether the ALJ's determination that Plaintiff retained the residual functional capacity to perform a limited range of medium work was supported by substantial evidence, and whether the ALJ applied the correct legal standards in reaching that conclusion. (Doc. #9 at 1). Specifically, Plaintiff contends the ALJ erred by failing to find that fibromyalgia was a severe impairment. (*Id.* at 10). Next, Plaintiff urges that the ALJ misapplied the standards governing medical opinion evidence by rejecting the opinions of Dr. Green, her treating family practice physician, and instead crediting the opinions of Dr. Padamadan, the one-time consultive examiner. (*Id.* at 13). Finally, Plaintiff argues that the ALJ erred in his assessment of her pain and credibility. (*Id.* at 15). She urges that the Commissioner's decision be remanded to correct the above errors.

The Commissioner contends that substantial evidence supports the ALJ's decision. (Doc. # 13). The Commissioner argues that the ALJ appropriately

14

declined to give controlling weight to the opinion of Plaintiff's family physician and reasonably explained his reasons for doing so. (*Id.* at 7). The Commissioner contends that the evidence of limitations due to fibromyalgia did not require accommodation beyond the contours of the ALJ's RFC determination. (*Id*. at 9). The Commissioner further argues that the ALJ properly followed the regulations in evaluating Plaintiff's credibility. (*Id.* at 12).

**B.     Medical Source Opinions**

        *1.     Treating Medical Sources*

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406; *see Wilson,* 378 F.3d at 544. A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Id.*

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the

frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544). More weight generally is given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. § 404.1527(d)(1). Nevertheless, the opinions of non-examining state agency medical consultants have some value, and under some circumstances, can be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as those of treating physicians, including supportability, consistency and specialization.

2.    *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180, at *2. Yet the Regulations do not permit an ALJ to

automatically accept (or reject) the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. § 404.1572(f); *see also* Ruling 96-6p at *2-*3.

## C.   Analysis

Plaintiff first contends that the ALJ erred at Step 2 of the sequential evaluation by not finding Plaintiff's fibromyalgia to constitute a severe impairment. (Doc. #9 at 10-12). Plaintiff urges that there are no objective medical signs to confirm the presence of fibromyalgia, and that the presence of trigger points is the primary diagnostic indicator of fibromyalgia. (*Id*. at 10-11). She also asserts that the ALJ inexplicably placed greater weight on the consultative examination results than on Plaintiff's treatment record. (*Id*. at 11).

A severe impairment is one that significantly limits the physical or mental ability to perform basic work activities. *See* 20 C.F.R. § 404.1521. An impairment can be considered non- severe, and the application rejected at the second stage of

the sequential evaluation process, only if the impairment is a slight abnormality that has such a minimal effect on the individual that it would not be expected to interfere with that individual's ability to work, irrespective of age, education and work experience. *Farris,* 773 F.2d at 90 (citation omitted).

Step 2 of the sequential analysis – determining whether the claimant has a severe impairment – presents "a *de minimis* hurdle in the disability determination process . . ." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "Under the . . . *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* This low evidentiary hurdle is intended to "screen out claims that are 'totally groundless.'" *Id.* (quoting in part *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89-90 (6th Cir. 1985)). The Court in *Higgs* characterized the dismissal of a disability claim at Step 2 based on medical evidence alone as "exceptional." 880 F.2d at 863.

The ALJ's discussion at Step 2 of Plaintiff's impairments includes the following paragraph about fibromyalgia:

> The claimant's fibromyalgia is not considered "severe" as it is not associated with any significant objective medical signs. Dr. Green has reported positive trigger points, but these were not seen on examination by Dr. Padamadan. She has not received trigger point injections and she has not been advised to do low

impact aerobic exercises, two standard treatment options for this condition. No specific treatment for lupus has been directed. Otherwise, she appears to retain normal strength and neurological functions. Nonetheless, her generalized body arthralgias (or chronic pain syndrome) have persisted and these symptoms have induced Dr. Green to prescribe narcotic medication such as Vicodin over a long term. Likely, her symptoms are caused or aggravated by a functional component and her excessive weight. Therefore, the combination of her arthralgias (by whatever diagnostic appellation one assigns them) and her obesity shall be considered "severe" impairments.

(Tr. 24-25, citation to record omitted).

The Sixth Circuit has recognized that fibromyalgia can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, (6th Cir. 2007) (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (*per curiam*)). Fibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion. *Rogers, supra.* The process of diagnosing fibromyalgia includes (1) testing a series of focal points for tenderness, and (2) ruling out other possible conditions through objective medical and clinical trials. *Id.* (citation omitted).

Despite that low evidentiary hurdle and the Circuit's foregoing affirmation regarding fibromyalgia diagnosis, ALJ Padilla's finding on this point cannot be said to constitute error. In this case, the only physician who found trigger points was treating physician Dr. Green. Dr. Padamadan, the consultative examiner who evaluated Plaintiff in May 2003 and again in August 2004, found no such trigger points diagnostically indicative of fibromyalgia. (*See* Tr. 189-97, 252-60). Thus, while the ALJ did not deny the existence of that condition, he had some reasonable basis for not including fibromyalgia among Plaintiff's "severe" impairments.

Moreover, an ALJ does not commit reversible error by failing to find that a particular impairment is severe where the ALJ determined that the claimant had at least one other severe impairment and then continued with the remaining steps in the disability evaluation, considering all impairments, including non-severe ones, in determining residual functional capacity. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). Here, although the ALJ did not find that Plaintiff's fibromyalgia to be "severe," he <u>did</u> find that "the combination of [Plaintiff's] arthralgias (by whatever diagnostic appellation one assigns them) and her obesity shall be considered 'severe' impairments." (Tr. 24-

25).  He then proceeded to evaluate the limitations caused by those impairments

through the remaining steps of the sequential evaluation.

The ALJ's RFC finding essentially relied on the opinions of the three state

agency reviewing physicians – Drs. Kelley, McCloud and Norris – who found

that Plaintiff's physical ability to perform basic work activities was not

significantly limited except in a few well-defined areas.  (*See* Tr. 180-88, 280-85,

375-76 ).  The ALJ noted that these assessments included input by specialists in

internal medicine and orthopedics (Tr. 28), thereby taking into consideration the

specialization factor referenced in the Regulations.  20 C.F.R. § 404.1527(d)(5).  In

addition, those assessments were consistent with the findings of Dr. Padamadan,

who reported that Plaintiff had normal strength, generally good range of motion,

Waddell signs in connection with her back complaints, and intact use of her

upper extremities.  (Tr. 189-97, 252-60).  Dr. Padamadan, too, felt that no basis

existed for limiting Plaintiff's physical activities.  (Tr. 256).  Accordingly, the

ALJ's analysis both complied with the applicable legal standards and was

supported by substantial evidence.

Plaintiff also contends that the ALJ erred by failing to give controlling or at

least great weight to Dr. Green's opinions.  (*See* Doc. #9 at 13-15; Doc. #14 at 2-3).

However, Plaintiff has not demonstrated that the ALJ applied incorrect standards

of law when evaluating the medical source opinions. (*See id.*); *see Wilson*, 378 F.3d at 545; 20 C.F.R. § 404.1527(d). The ALJ concluded that Dr. Green's opinions were not entitled to controlling weight because they were based on Plaintiff's "uncorroborated subjective allegations and are inconsistent with the mild objective medical data." (Tr. 28). Dr. Green's opinions also are inconsistent with the other evidence of record. For example, as noted above, Dr. Svetic reported few objective findings and specifically noted that Plaintiff's chronic headaches were caused by medication overuse. (Tr. 382-83, 384-85). In addition, Dr. Padamadan noted that Plaintiff's clinical findings essentially were within normal limits and that she had no physical limitations. (Tr. 252-60). Further, Dr. Green's opinions are inconsistent with the reviewing physicians' opinions. (*See* Tr. 180-88, 280-85, 375-76).

Plaintiff has not established that the ALJ erred as a matter of law in weighing these medical source opinions or that substantial evidence did not support the opinions of these medical sources. *See, e.g., Rogers.*, 486 F.3d at 234; *Wilson*, 378 F.3d at 541. Without such a showing, the Court is not free to re-weigh the medical source opinions or to resolve other evidentiary conflicts. *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001)("there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."); *see also Her v.*

22

*Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir.1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").

Plaintiff's final argument relates to the ALJ's evaluation of her pain and credibility. Plaintiff argues that the ALJ's analysis of pain and credibility is fundamentally flawed due to his failure to consider Plaintiff's fibromyalgia a severe impairment (a contention that has been addressed, *supra*). Plaintiff contends the ALJ also erred by overstating Plaintiff's activities and ignoring her work history. (Doc. #9 at 15-17).

"'There is no question that subjective complaints of a claimant can support a claim for disability, if there is also evidence of an underlying medical condition in the record.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Jones v. Comm'r. of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (other citation omitted)). Yet "'an ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability.'" *Id*. An ALJ's credibility determinations must be

supported by substantial evidence, but "[n]otably . . . are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Id.*

Contrary to Plaintiff's contentions, substantial evidence supports the ALJ's credibility determination. The ALJ reasonably found that certain factors undermined Plaintiff's credibility. (*See* Tr. 28-29). He accurately recognized that Plaintiff had received mostly conservative care, with the exception of her shoulder surgery, which yielded good results. (*Id.*). Plaintiff had not required any recent inpatient care of extended duration. (*Id*). The ALJ also correctly noted that Plaintiff appeared to have been overly dependent on strong narcotic pain medication. (*Id.*). In June 2005, Plaintiff reported to Dr. Svetic that although she understood the concept of rebound headaches, she could not stop using of Vicodin, Soma and Ultram. (Tr. 382-83). Additionally, the ALJ observed that the record does not contain evidence substantiating Plaintiff's testimony that connected her medication to her reported feelings of drowsiness. (Tr. 28, 464).

Finally, the ALJ considered Plaintiff's daily activities, which included housework, cooking, driving, shopping, socializing, engaging in church activities, and even taking a trip to Orlando, Florida, all of which undermined her subjective complaints of disability. (Tr. 87-90, 204, 207, 263, 265, 462-68).

Dr. Padamadan, who examined Plaintiff twice, found no diagnostic trigger points, and in fact noted that Plaintiff compared her exam to receiving a massage. (Tr. 189-96, 252-60). He also observed Plaintiff react out of proportion to the evidence of her physical condition. (Tr. 245-47). Aside from the rejected opinion of Dr. Green, no physician opined that Plaintiff has limitations beyond those found by the ALJ. Absent such evidence, the ALJ was not required to credit Plaintiff's testimony or her complaints of pain.

Accordingly, for all the above reasons, Plaintiff's Statement of Errors lacks merit.

**IT THEREFORE IS RECOMMENDED THAT:**

1. The Commissioner's final non-disability determination be AFFIRMED; and

2. This case be TERMINATED on the docket of this Court.

May 21, 2010                                    _____s/ Sharon L. Ovington_____
                                                  Sharon L. Ovington
                                                  United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Am,* 474  U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).